USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/23/2025_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WADE MULLEN,

                Plaintiff,

-against-

BODUM USA, INC.,

                Defendant.

23 Civ. 1166 (AT)

**OPINION AND ORDER**

ANALISA TORRES, District Judge:

    Plaintiff, Wade Mullen, brings this products liability action against Defendant, Bodum USA, Inc. ("Bodum"), seeking damages for injuries he sustained when his Bodum French press shattered and sprayed him with hot coffee. *See generally* Compl., ECF No. 1. Before the Court are Bodum's motion for summary judgment and motion to exclude expert evidence submitted by Mullen concerning the cause of the French press' shattering. Mot., ECF No. 51. For the reasons stated below, both motions are granted in part and denied in part.

**BACKGROUND**[1]

    In the spring of 2020, Mullen's wife gifted him a Bodum eight-cup Brazil Model French press, which she purchased from Target. Def. 56.1 ¶¶ 1–2, ECF No. 59. For the next nine or ten months, Mullen used it daily without incident. *Id.* ¶¶ 2, 4–5. On the morning of March 7, 2021, however, soon after pouring hot water into the French press' carafe, Mullen noticed the carafe's glass sides start to crack. *Id.* ¶¶ 1, 6–9. He picked up the French press by its handle to pour its contents into the sink, at which point it broke apart, spilling hot water and coffee grounds on Mullen's legs and feet. *Id.* ¶¶ 9–10. Mullen's feet turned red and tender, and he visited his

---

[1] These facts are taken from Bodum's Rule 56.1 statement, Mullen's response, and the parties' declarations and accompanying exhibits, unless otherwise noted. Citations to a paragraph of Bodum's Rule 56.1 statement also include Mullen's response.

primary care physician the following day for treatment. *Id.* ¶¶ 12–14. The physician noted that Mullen had "faint erythema"—skin redness—on his shins and feet but that "no skin breakdown [was] present." Def. Ex. C at 6.[2]

On February 10, 2023, Mullen filed this suit against Bodum. Compl. Over the following year and a half, the parties engaged in discovery. Before the Court are Bodum's motion for summary judgment and motion to exclude the expert opinions of Mingxi Zheng, an engineer who inspected the shattered French press. Mot.; *see* Mem., ECF No. 53; Opp., ECF No. 57; Reply, ECF No. 61; Report, Def. Ex. 12.

## DISCUSSION

I. Medical Causation

A. Legal Standard

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P.

---

[2] Citations to "Def. Ex." are to the exhibits attached to the declaration of Jason A. Wheeler at ECF No. 54.

56(c)(1)(A). If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006). The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in [his] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

    B. Analysis

Bodum argues that Mullen cannot establish medical causation because he fails to offer expert medical evidence linking the spilled coffee to physical injury. *See* Mem. at 11–13. Mullen, in response, claims that the hot coffee burned him and that expert evidence is not necessary to prove that fact. Opp. at 22–24.

"It is black-letter law that a plaintiff, seeking to prevail on a personal injury claim, must show causation, meaning that the defendant's conduct was the proximate cause of [his] injuries." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) (citation omitted). Sometimes, expert evidence is necessary to demonstrate such causation. *See Riad v. Porsche Cars N. Am., Inc.*, No. 18 Civ. 5175, 2024 WL 3606315, at *3 (E.D. Pa. July 30, 2024) (explaining that Pennsylvania courts generally require expert medical evidence in personal injury actions and listing cases).[3] But not always. Expert evidence is not necessary when a factfinder is "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)). Thus, a plaintiff need not adduce expert evidence "if there is an *obvious* causal relationship between the alleged negligent act and the injury complained of," *Riad*, 2024

---

[3] The Court applies Pennsylvania law because Pennsylvania, where Mullen acquired the French press, lives, and makes coffee, has the greatest interest in this matter. *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336–37 (2d Cir. 2005); Compl. ¶¶ 1–4.

WL 3606315, at *2 n.7 (citation omitted); *see Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978), in other words, when an injury is "either an immediate and direct or the natural and probable result of the alleged negligent act," *Lattanze v. Silverstrini*, 448 A.2d 605, 608 (Pa. Super. Ct. 1982) (citation omitted).

Bodum points out that Mullen did not seek emergency medical services or receive specific treatment for burns and that he therefore cannot demonstrate that the spilled coffee injured him.[4] Mem. at 11–13; *see* Mullen Dep. at 72:4–73:25, ECF No. 58-1; Def. Ex. C at 6 (physician's note that Mullen had "no skin breakdown[] present" the day after the incident). The record establishes, however, that the spilled coffee immediately caused Mullen's affected skin to become "red and tender," and that when Mullen visited his primary care physician the following day, the doctor observed "faint erythema" on Mullen's shins and feet and told Mullen to apply ointment if his skin bothered him. Mullen Dep. at 72:20–73:25; Def. Ex. C at 6. Mullen also reported that the skin on the bottom of his foot began to blister within a week of the incident. Mullen Dep. at 72:17–24. The connection between Mullen spilling hot coffee on his lower extremities and his legs and feet immediately growing red and tender is the type of "obvious" causal relationship that does not require verification by an expert. *Riad*, 2024 WL 3606315, at *2 n.7. Although Mullen's burns were evidently not severe, the issue is one of damages, not causation.[5] The Court, therefore, denies summary judgment on this ground.

---

[4] Mullen previously appeared to believe that his small fiber idiopathic neuropathy was caused or exacerbated by the spilled coffee. *See* Def. 56.1 ¶¶ 19–21, 23–24, 27; *see* Def. Ex. B at 4; Def. Ex. E. After seeking advice from a doctor, Mullen now acknowledges that his diagnosis is unrelated to the spill. Def. 56.1 ¶¶ 25–26.

[5] The Court also rejects Bodum's argument that this case must be dismissed for lack of diversity jurisdiction because Mullen's neuropathy was not caused by the French press shattering, and he can therefore no longer claim damages of at least $75,000. Reply at 5–6; *see* 28 U.S.C. § 1332(a). "[F]or purposes of diversity jurisdiction, the amount in controversy is established as of the date of the complaint and is not reevaluated based on post-filing events." *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 506 (2d Cir. 2005). Although a court may reevaluate the amount in controversy when post-filing events suggest that the amount claimed in the complaint was alleged in bad faith or reflected a mistake, *see id.* at 507, Bodum adduces no evidence indicating that such exceptions apply here. "Where

4

II.  Zheng's Opinions

A. Legal Standard

Federal Rule of Evidence 702 provides that an expert witness may offer testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Although the proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that these requirements are satisfied, the district court is the "ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citation omitted). The standard for admissibility is liberal, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 411 (1993)); *see Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (explaining that expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison'" (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996))).

The test boils down to three factors. *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 352 (S.D.N.Y. 2023). In deciding whether to exclude expert evidence, a court considers: "(1) the qualifications of the expert to testify as to a particular matter, (2) the

---

the damages sought are uncertain," as they are in this case, "the doubt should be resolved in favor of the plaintiff's pleadings." *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994).

reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will 'assist the trier of fact')." *Id.* (citation omitted).

To determine whether an expert is qualified, a court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Conti v. Doe*, No. 17 Civ. 9268, 2020 WL 6162104, at *7 (S.D.N.Y. Oct. 21, 2020) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). An expert who is highly qualified to testify to certain subjects may be unqualified to testify to others, and "[e]xpert testimony that strays outside the expert's area of qualified expertise must be excluded." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 MD 2542, 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025).

Next, the court looks at the reliability of the expert's methodology and the underlying data. It considers "whether a theory or technique ha[s] been and could be tested, whether it ha[s] been subjected to peer review, its error rate, and its degree of acceptance within the relevant scientific community." *In re Mirena*, 169 F. Supp. 3d at 412 (citing *Daubert*, 509 U.S. at 593–94). Also relevant is whether a "sufficiently rigorous analytical connection" exists between the expert's methodology and conclusions. *Id.* Ultimately, the court's inquiry is "fluid," and it has broad discretion to determine "what method is appropriate for evaluating reliability under the circumstances of each case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265–66 (2d Cir. 2002).

Finally, to determine whether expert evidence is relevant, the court evaluates "whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," in other words,

whether it satisfies the standard of Federal Rule of Evidence 401. *Id.* at 265 (alteration adopted) (citation omitted).

        B.  Application

Bodum contends that Zheng's report should be excluded on reliability grounds, first, because it contains analytical gaps concerning what caused the French press to shatter, and second, because Zheng did not support her analysis of alternative French press designs with testing of the proposed alternatives.[6] Mem. at 14–17.

        1.  Causation

Bodum argues that Zheng's report contains four analytical leaps: First, Zheng assumes that the scratches and stainless steel residue found on the inside of the French press' glass carafe came from the metal coil on the press' plunger "without having done any testing or analysis to determine if in fact there was any contact between the stainless steel plunger component and the glass." *Id.* at 14. Second, Zheng concludes that the defects resulting from the contact between the plunger's metal coil and the carafe could cause the French press to shatter without testing to determine whether such contact "could actually cause a scratch of sufficient dimension and depth to reduce the tensile strength to the point where thermal stress could cause a fracture." *Id.* at 15. Third, Zheng conducts no testing to support her conclusion that thermal stress from the hot coffee caused the French press to facture. *Id.* at 15–16. And fourth, Zheng does not rule out alternative causes for the French press' shattering. *Id.* at 16.

First, the Court considers Zheng's opinion that, "more likely than not," the plunger's protruding coil is what scratched the press' glass carafe and created crack initiation sites. Report

---

[6] Bodum does not argue that Zheng, an experienced materials scientist and engineer, *see* Report at 3–4, is unqualified to offer the analysis contained in her report, or that the analysis is not relevant to deciding the issues at hand.

7

at 9.  Zheng reached this conclusion after she analyzed the metal residue observed by the crack initiation site and found it to be made of stainless steel, the same material contained in the press' plunger and the protruding coil.  *Id.* at 9–11.  Although, as Bodum notes, Zheng did not conduct testing to determine whether the metal coil actually scratched the glass, lack of testing is not necessarily fatal, *see Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 559 (S.D.N.Y. 2005); *Byrne v. Gracious Living Indus., Inc.*, No. 01 Civ. 10153, 2003 WL 446474, at *1 (S.D.N.Y. Feb. 25, 2003), and it would have been difficult to conduct such testing on the device given its destruction.  Considering that Mullen was the only person to use the French press, Def. 56.1 ¶ 3, and that the plunger is designed to fit snugly within the walls of the press, *see* Report at 11, Zheng's assumption that the metal coil left residue on the glass carafe is not "so unrealistic and contradictory as to suggest bad faith," *Zerega Ave. Realty*, 571 F.3d at 214 (quoting *Boucher*, 73 F.3d at 21).

The same can be said of Zheng's opinions that the damage resulting from the contact between the metal coil and the glass carafe was severe enough to permit thermal fracturing, and that thermal fracturing did indeed occur.  *See* Report at 7–8.  Zheng concluded that thermal fracturing occurred after observing (1) Wallner lines perpendicular to the carafe's surface, (2) cracks that formed near-ninety-degree angles with the edge and surface of the glass, and (3) the absence of branching crack patterns, all of which are indicators of thermal stress.  *Id.* at 7.  Zheng cites an academic text supporting the proposition that visual examination of such markings is a tested and accepted method of analyzing the causes of fracturing.  *See id.* at 7 n.7 (citing George D. Quinn, Nat'l Inst. of Standards & Tech., *Fractography of Ceramics and Glasses* 4-39 (3d ed. 2020)); Quinn, *supra*, at 4-1 ("Analysis begins with a simple visual examination of the broken pieces.").  Bodum can hardly challenge this methodology as

8

unreliable; its own expert used the same method to conduct his fracture analysis. *See* Ganot Report at 7–9, Def. Ex. 11 (explaining that Bodum's expert examined the fracture surface for Wallner lines using optical microscopy). Rather, Bodum takes issue with Zheng's failure to conduct additional testing to determine what level of thermal shock would be necessary to shatter the French press given the existence of the imperfections observed on the glass carafe. Again, testing is "not an 'absolute prerequisite' for an expert's theory of causation . . . to be admissible in a design defect case," *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 76 (S.D.N.Y. 2001) (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996)), and the Court shall not exclude the opinion of an expert who used an accepted analytical method merely because she did not use all possible methods.

The Court also declines to exclude Zheng's opinions for failing to "rule out fracture due to any other alternative cause." Mem. at 16. The law is clear that "an expert need not rule out every alternative in forming an opinion." *In re Mirena*, 169 F. Supp. 3d at 460. Although the most convincing expert reports are likely to address alternative causal mechanisms, for an opinion to be admissible, an expert need address only "obvious alternative explanations" for the phenomenon in question. *See id.* (quoting *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005)). Here, there is no "obvious" alternative that could explain the French press' shattering, nor does Bodum propose any. *See* Mem. at 16. The Court, therefore, denies Bodum's motion to preclude Zheng's opinions on causation. Bodum may pursue any weaknesses in Zheng's conclusions on cross-examination.

2. Alternative Designs

Bodum next argues that Zheng's opinion regarding alternative product designs should be excluded because Zheng did not test any of her proposed alternatives. Mem. at 17.

In her report, Zheng explains that she reviewed Bodum's website and found, based on the company's image of the replacement part containing the metal coil, that a protruding coil "is the normal condition for this part." Report at 11–12. She extrapolates that the protruding coil is a design or manufacturing defect because it allows for the extra pressure of a sharp exposed edge to scratch the inner surface of the glass carafe, which may bring about "compromising contact." *Id.* at 11. Based on this finding, Zheng concludes that three alternative design options exist that would reduce or eliminate glass fracture. *Id.* at 13. First, Bodum could—and has—designed a French press with a non-glass carafe. *Id.* Second, Bodum could use silicone or a different temperature-resistant soft material on the edge of the plunger to act as a barrier between the plunger's steel components and the carafe. *Id.* And third, Bodum could weld or tack down the protruding coil to prevent it from scratching the glass. *Id.*

The Court grants Bodum's motion to exclude this portion of Zheng's report. The issue is one of methodology. Zheng's opinion on alternative designs is not "ground[ed] in the methods and procedures of science," but is rather a conclusion that any lay person could draw by visually inspecting the plunger and searching the internet for varieties of French presses. *Daubert*, 509 U.S. at 580; *see Colon*, 199 F. Supp. 2d at 76 (explaining that, although testing is not required for a court to admit an expert opinion concerning alternative designs, "it is usually critical to show that an expert adhered to the same standards of intellectual rigor that are demanded in their professional work" (alteration adopted) (citation omitted)). Because the opinion lacks the reliability necessary for the introduction of expert evidence, the Court excludes it.

C. Effect of Exclusion

This exclusion is not, as Bodum argues, fatal to Mullen's claims. Mullen brings claims for strict liability and negligence under theories of defective design, defective manufacture, and failure to warn. *See* Compl. ¶¶ 19–40.

Strict liability law in Pennsylvania mirrors § 402A of the Second Restatement of Torts. *See Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 395 (Pa. 2014). A plaintiff must establish two elements: "that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury." *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1171 (Pa. 1995) (quoting *Walton v. Avco Corp.*, 610 A.2d 454, 458 (Pa. 1992)); *see Mains v. Sherwin-Williams Co.*, 640 F. Supp. 3d 373, 384 (E.D. Pa. 2022).

A product may be defective for three reasons: design, manufacture, and failure to warn. *Phillips*, 665 A.2d at 1170. A design defect claim is a claim that a product was constructed in accordance with its intended design but that the design is "unreasonably dangerous" to the user. *McPeak v. Direct Outdoor Prods., LLC*, No. 19 Civ. 3719, 2022 WL 4369966, at *3 (E.D. Pa. Sept. 20, 2022) (quoting *Tincher*, 104 A.3d at 328). A manufacturing defect claim "is essentially a claim that something went awry in the manufacturing process." *Chandler v. L'Oreal USA, Inc.*, 340 F. Supp. 3d 551, 564 (W.D. Pa. 2018) (citation omitted). And a failure-to-warn claim is a claim that a product was distributed "without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Phillips*, 665 A.2d at 1171 (quoting *Mackowick v. Westinghouse Elec.*, 575 A.2d 100, 102 (Pa. 1990)).

A plaintiff can show the existence of a design defect by demonstrating (1) that the danger of using the product "is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectations standard") or (2) that "a reasonable person would conclude that the

11

probability and seriousness of [the] harm caused by the product outweigh the burden or costs of taking precautions" (the "risk-utility standard"). *Mains*, 640 F. Supp. 3d at 384 (citation omitted); *see Tincher*, 104 A.3d at 335. The existence of a manufacturing defect can be established either by direct evidence of a machine breakdown or by circumstantial evidence that a product malfunctioned and there was no "abnormal use" or "reasonable, secondary causes" for the malfunction. *Rogers v. Johnson & Johnson Prods., Inc.*, 565 A.2d 751, 754 (Pa. 1989); *see Smith v. Howmedica Osteonics Corp.*, 251 F. Supp. 3d 844, 851 (E.D. Pa. 2017). And for failure-to-warn claims, a plaintiff must show "that a warning of a particular danger was either inadequate or altogether lacking, making the product 'unreasonably dangerous.'" *Phillips*, 665 A.2d at 1171.

Turning to Mullen's claims for negligence, Pennsylvania courts similarly follow the Second Restatement of Torts. *Foge, McKeever LLC v. Zoetis Inc.*, 565 F. Supp. 3d 647, 653 (W.D. Pa. 2021); *see* Restatement (Second) of Torts §§ 388 (failure to warn), 395 (manufacturing defects), 398 (design defects). In the negligence context, where "the main focus is on conduct," the distinction between the three theories is less clear than in the strict liability context, where "the focus is exclusively on the product." *Lance v. Wyeth*, 85 A.3d 434, 458 (Pa. 2014); *see id.* ("[I]n the negligence arena at least, the substantive allegations are more important than the labels.").

Bodum appears to argue that, without Zheng's opinions on alternative designs, Mullen cannot establish that the French press is defective, dooming all his claims. *See* Mem. at 18–19. Caselaw suggests otherwise. Although expert evidence concerning the existence of an alternative design is relevant to a defect determination under both the consumer expectations and risk-utility standards, it is not required to satisfy either test. *McPeak*, 2022 WL 4369966, at *5;

*see Douglas v. Atrium Med. Corp.*, No. 23 Civ. 747, 2023 WL 8643638, at *6 (M.D. Pa. Dec. 11, 2023). That is especially true when, as here, the alleged defect is relatively simple, and a jury would be "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject[s]" at issue. *Mains*, 640 F. Supp. 3d at 385 n.13 (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000)).

Nor is expert evidence on alternative designs required to show a design defect under a negligence theory. *See Douglas*, 2023 WL 8643638, at *6 ("One way a plaintiff can demonstrate [negligent design] is by arguing the availability of a safer, feasible alternative design. Alternatively, the plaintiff could argue that the design was so defective that it rendered the device to be so dangerous that it should not be [used] by anyone."). As for Mullen's manufacturing defect claims, those claims do not involve considerations of how a product was designed, but rather how it was physically produced, so the existence of an alternative design is not relevant. *See Colon*, 199 F. Supp. 2d at 86. Summary judgment, therefore, is not warranted.

The Court will, however, grant Bodum summary judgment on Mullen's failure-to-warn claims. Apart from conclusory allegations that Bodum failed to warn consumers about the dangers of its French press, Compl. ¶¶ 25, 29–30, 39, Mullen has not suggested any possible warning that Bodum could have issued that would address the French press' alleged danger or lead Mullen to change his behavior in response, *see Phillips*, 665 A.2d at 1171; *Chandler*, 340 F. Supp. 3d at 564. Nor could the Court imagine such a warning; given the facts alleged, a user could avoid the risks allegedly associated with the French press only by not using it at all.

Finally, Bodum argues that, even if the Court does not exclude Zheng's expert opinions, Bodum is entitled to summary judgment because the report of its expert, Gabriel Ganot,

13

"conclusively refutes Plaintiff's theory of defect that the source of the facture was thermal." Mem. at 19; *see* Def. Ex. 11 (Ganot report). This argument fails; as long as Zheng's opinions are admissible, which they largely are, there exists a material dispute of fact as to what caused the French press to shatter, precluding summary judgment.

## CONCLUSION

For the foregoing reasons, Bodum's motions for summary judgment and to exclude Zheng's expert opinions are GRANTED IN PART and DENIED IN PART.

By **June 30, 2025**, the parties shall jointly inform the Court whether they believe a referral (1) for a settlement conference before a magistrate judge or (2) to mediation would be appropriate. If the parties are not amenable to settlement discussions, the Court shall set a trial date and motions schedule.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 51.

SO ORDERED.

Dated: June 23, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge